IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  39161-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| JAMES RAY HOUSE, JR., | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — We struggle once again to make sense out of the concepts of "same criminal conduct" and "same criminal intent" as expressed in RCW 9.94A.589(1)(a) and as interpreted by the Washington Supreme Court.  James House pled guilty to first degree burglary, indecent liberties, second degree assault, and unlawful imprisonment.  House committed all offenses against his former girlfriend and mother of his children during the early morning hours of September 17, 2020.  At sentencing, the trial court ruled that the burglary and assault convictions constituted the same criminal conduct for purposes of calculating House's offender score.  On appeal, House contends the sentencing court should have also adjudged the indecent liberties and unlawful imprisonment offenses as the same criminal conduct as the assault and burglary.  He further contends the trial court failed to determine whether an earlier conviction for harassment was the same course of

conduct as a residential burglary committed on the same date and sentenced at the same time.

FACTS

James House incurred convictions relevant to this appeal before committing his crimes against his girlfriend on September 17, 2020. The plea agreement signed by James House, in the current prosecution, listed the following earlier convictions:

1.4    PROSECUTOR'S UNDERSTANDING OF DEFENDANT'S CRIMINAL HISTORY
       (RCW 9.94A.525):

| Crime | Date of Crime | Crime Type | Adult or Juv | Place of Conviction | Sent. Date |
|-------|---------------|------------|--------------|---------------------|------------|
| RES BURGLARY | 011195 | NV | A | KING CO, WA | 030395 |
| HARASSMENT | 011195 | NV | A | KING CO, WA | 030396 |
| ASSAULT 3 | 063094 | NV | A | KING CO, WA | 090984 |
| ASSAULT 2 | 082587 | VIOL | A | KING CO, WA | 121487 |
| ROBBERY 2 | 022484 | VIOL | A | KING CO, WA | 080284 |
| DV ASSAULT | 041813 | MISD. | A | SPOKANE CO, WA | 071713 |
| DV ASSAULT 4 | 120704 | MISD. | A | GRANT CO, WA | 011905 |
| DV ASSAULT 4 | 071497 | MISD. | A | SPOKANE CO, WA | 010600 |
| DV VIOL NCO | 051094 | MISD. | A | KING CO, WA | 100896 |
| DV VIOL NCO | 032594 | MISD. | A | KING CO, WA | 100896 |

Clerk's Papers (CP) at 124-25. The convictions for residential burglary and harassment on January 11, 1995 bear particular importance in this appeal.

This appeal still focuses on the crimes committed in September 2020. Although the only issues on appeal concern sentencing, we outline the underlying facts behind the September 2020 crimes in order to analyze James House's challenge to his offender score. Under House's theory of the law, the underlying facts assist in determining same criminal conduct.

The prosecution against James House arose from his relationship with his girlfriend C.M. C.M. was 19 years old, in 2013, when she met James House, then 47 years old. The couple, who never married, begot three children during their seven-year association.

In August 2020, James House and C.M. separated, at which time House moved from the family residence. On an unidentified day during the first week of September 2020, House returned to the home and delivered C.M. $100. During this visit, House repeatedly asked for sex, which entreaties C.M. declined. House grabbed C.M.'s pants, forced her down, and engaged her in oral sex without her consent.

On the evening of September 16, 2020, C.M. was home with the children. House sent C.M. texts expressing his intent to journey to the home to give her money. C.M. responded that he was not welcome and not to come. C.M. disclosed she was expecting a man to visit that night. House announced he planned to come anyway.

On September 16, C.M., as a result of the earlier sexual assault, messaged her current boyfriend, Kerry Kinnon, that House intended to visit the home uninvited. She also attempted to contact her brother to ask that he come to the home to protect her. We assume that C.M. failed to reach her brother, but the record does not confirm such. When House had not appeared by 10 p.m., C.M. retired to bed in her room as her children slept on living room couches.

James House entered the residence at 1:37 a.m., on September 17, through use of a key he copied without C.M.'s knowledge. C.M. awoke to House, armed with a knife, crying inside her bedroom. House protested his love for C.M. and expressed jealousy. House threatened to kill any man, with whom she socialized.

James House walked with C.M. to the living room, where the two spoke. We assume the children continued to sleep in the living room. C.M. told House to leave multiple times. House enveloped C.M. in a chokehold and dragged her to the bedroom. The choke blocked C.M.'s airway such that she could not breathe. C.M. lost vision. She went in and out of consciousness several times during the strangulation. C.M.'s tongue protruded from her mouth. She bit on the tongue so hard, she thought she might have bitten it off, but her mouth refused to respond to an internal command to stop. C.M. lost control of her bowels and defecated. C.M. estimates House strangled her for ten minutes. She concluded she would perish.

C.M. finally could communicate to James House that she had defecated and asked him to release her so she could clean herself. House uttered that he did not care, and he resumed the choking, this time for two minutes. House tearfully commented to C.M. that he choked her because of his love for her.

James House eventually released C.M., and she entered the bathroom to wash. From the restroom, C.M. saw House remove and unsheathe a large, fixed-blade knife. C.M., from the bathroom, inquired from House of his intentions. A sobbing House

4

announced that he had come to the home to kill her, but he had now decided not to do so. C.M. believed that House would kill her, and she begged for her life. She told House he could not kill the mother of his children. House responded with the familiar refrain that, if he could not have her, nobody could.

James House directed C.M. to exit the bathroom and lie on the bed. C.M. complied and asked House to remove his coat and inter the knife. House deposited the knife in his coat pocket and shed his coat. He performed oral sex on C.M. without her consent. After thirty seconds, a nervous and sweating House stood and announced that he "could not do it." CP at 159. House then penetrated C.M.'s vagina with a sexual device and without her consent. C.M., in an endeavor to end the death threats, told House to engage her in sexual intercourse. House declined. At C.M.'s suggestion, the two entered the bedroom closet and smoked cigarettes.

After smoking, C.M. returned to the bathroom to finish cleansing herself. C.M. heard her cell phone vibrating in the bedroom, which sound represented an incoming call. Earlier on the morning of September 17, C.M.'s male friend, Kerry Kinnon, had retrieved C.M.'s text message that James House intended to come to her apartment. Kinnon called 911. Kinnon called C.M.'s phone eight times between 2:19 and 2:40 a.m.

C.M. also heard a key at the front door. C.M. saw that James House also heard the noise so she shut and locked the bathroom door. Unbeknownst to C.M. and House, Kerry Kinnon, attempted to enter the residence. House crashed the bathroom door and, while

5

holding a knife, rushed toward C.M. C.M. yelled: "'James, don't kill me!'" hoping the person at the front door, who she believed was Kinnon, would hear. CP at 160. House stood behind C.M., restrained C.M. with one hand, held the knife in the other hand at her waist, and warned her not to "'say shit.'" CP at 160.

James House walked C.M. to the front door and looked through the peephole. House saw no one outside. C.M. donned boxer shorts that she retrieved from the nearby laundry room. House walked C.M. through the children's bedroom. He lit a lighter and gazed through the room for anyone hiding. He remarked that people were coming for him. House added that he faced prison for attempted murder and kidnapping. House declared: "'Even if I don't kill you, I'm still going to prison.'" CP at 160.

C.M. once again attempted to calm James House, and she suggested the two lay on the bed. House said no and expressed again a desire for sex. House performed oral sex a second time on C.M. without her permission. He ceased the activity and asked C.M. if she wanted him to leave or have sex. House unexpectedly announced he would leave. C.M., hoping to hasten House's exit, awoke the children to tell him goodbye. House then refused to leave. C.M. directed House to return to the bedroom and lie on the bed.

C.M. pivoted to the bedroom and reclined on the bed. James House followed and sat on the couch next to the bed. House rested his hand that gripped the knife near C.M. She asked why he placed the knife near her. House explained: "'I'm telling you right

6

now if the cops come, I'm going to stab you in the eyes and kill you.'" CP at 160. C.M. cried and again pleaded for her life. She insisted that no police were coming.

Minutes later, sounds emanated from the front door. The door opened and law enforcement officers yelled: "'Spokane Police!'" CP at 160. James House reflexively moved the knife toward C.M.'s face. C.M. lifted her left arm up to block House's forearm. C.M. suffered multiple stab wounds to her face and hands. House stopped the attack when police entered the bedroom.

Multiple Spokane police officers had arrived at C.M.'s apartment and forcibly entered the home. Officers heard C.M. frantically screaming from a back bedroom. Police found James House on top of C.M. on the bed. Police separated House from C.M. C.M. spoke in a whisper as she complained of throat pain. C.M.'s tongue suffered deep bruises along the left side of her tongue.

To repeat, C.M. noted that James House entered her home at 1:37 a.m. Reports record that someone notified emergency dispatch at 2:19 a.m., and law enforcement officers entered the home at 2:24 a.m.

PROCEDURE

The State of Washington charged James House with first degree burglary, first degree kidnapping with sexual motivation, two counts of second degree rape, two counts of second degree assault, and two counts of harassment. The State alleged that House committed all offenses against an intimate partner. The State added that House was

7

armed with a deadly weapon for purposes of sentencing enhancements attended to the burglary charge and one assault charge.

When alleging, in the charging information, that James House committed the crime of burglary, the State asserted that House entered C.M.'s home with the intent to commit a crime against a person or property, but the information did not identify the intended crime. Once inside the residence, according to the information, House assaulted C.M. The State alleged House committed one count of second degree assault by strangulation and the second count by use of a knife, a deadly weapon.

At the beginning of trial, the parties reached a plea deal, under which James House would plead guilty to the one count of first degree burglary predicated on the assault committed inside the home. The State would reduce the two rape charges to one count of indecent liberties, to which House would plead guilty. House would plead guilty to one count of second degree assault, while the State would dismiss the second charge. The State would reduce the kidnapping charge to one count of unlawful imprisonment, to which House would plead guilty, and the State would dismiss the harassment charges. Each charge would carry a domestic violence appellation.

During the plea hearing, James House, through counsel, commented that some of the crimes, to which House pled guilty, might entail the same criminal conduct for purposes of sentencing. Defense counsel noted that the State, however, did not consider any two of the convictions to form the same criminal conduct. The trial court asked

House if he understood that the State insisted that no two crimes constituted the same criminal conduct and that his offender score totaled nine, although the court would later perform its own scoring. House worried about and asked the court if he could receive a life sentence. The trial court responded that House would not receive a life sentence, but that the court might sentence him based on an offender score of nine.

Based on James House's plea, the trial court entered a judgment of convictions against James House for first degree burglary, indecent liberties, second degree assault, and unlawful imprisonment. The court designated each crime as entailing domestic violence.

The trial court sentenced James House at a later date. During the sentencing hearing, the State's counsel remarked that House would argue same criminal conduct as to some of the current convictions. The State conceded that the court should score the first degree burglary and second degree assault as one for purposes of the offender score because the assault constituted the predicate crime for the first degree burglary. The State maintained that the only two convictions to form the same criminal conduct were the burglary and assault, such that the convictions for indecent liberties and unlawful imprisonment should be scored separately. As to the first degree burglary conviction, which carried the highest penalty, the court, according to the State, should calculate the offender score at nine. The State did not identify how it arrived at the score of nine.

During the sentencing hearing, James House, through counsel, argued for an offender score lower than nine. House did not offer a particular score. But he noted that he could not have committed the crimes of indecent liberties and assault without first committing burglary and unlawful imprisonment. House conceded that, because of a break in time between the assault and indecent liberties, the two convictions might be scored separately.

After argument by both counsel, the sentencing court resolved to score the burglary and assault as the same criminal conduct because the assault was the predicate crime for the burglary. The superior court determined to score the unlawful imprisonment and indecent liberties convictions separately from one another and separately from the burglary and assault. The court asked if, with its ruling, the offender score remained at nine. The State answered in the affirmative. The State added that, because of the addition of a point for a domestic violence offense and another point for a violent offense, the offender score totaled eleven. The record contains no written calculation by the State as to how it arrived at a score of eleven or nine plus.

The superior court sentenced James House to 116 months based on an offender score of nine. When arriving at the score, the court added one point based on the convictions in January 1995. The record does not disclose how the superior court arrived at the offender score.

LAW AND ANALYSIS

On appeal, James House faults the sentencing court for failing to score the two 1996 convictions, for crimes committed in 1995, as one point because the crimes constituted the same criminal conduct and for failing to score more than two of his current convictions as the same criminal conduct. We address the two arguments separately.

1996 Convictions

In 1996, the State convicted James House with burglary and harassment for conduct occurring on January 11, 1995. In this appeal, House assigns error to the sentencing court's failure to consider the two 1996 convictions as constituting the same criminal conduct such that the two convictions only count as one for his offender score. In response, the State argues that, although the sentencing court assigned two points to the 1996 convictions, it only did so based on the burglary conviction. Even if the prior offenses of burglary and harassment formed the "same criminal conduct," the harassment conviction washed out because of the passage of time and the court assigned no score to the harassment conviction. In short, according to the State, House bases his argument on erroneous facts.

In his reply brief, James House conceded the State's position, but for a wrong reason. House erroneously wrote that the sentencing court did not consider either of his 1996 convictions in the offender score. But House again errs on the facts. The

sentencing court scored the 1996 convictions as two but only because of the serious

nature of the burglary conviction. According to the State, the passage of time wiped out

the harassment and only the harassment conviction. The harassment conviction carried a

quicker wash out period than the burglary conviction. The State once again argues that

scoring the harassment conviction as the same criminal conduct as the burglary

conviction lacks importance since the court never considered the harassment conviction

in the score.

We agree with the State. RCW 9.94A.525(2) establishes the rules for determining

when an earlier offense can no longer be counted in the offender score. Practitioners and

court decisions label this phenomenon a "wash out." With some exceptions, class B

prior felony convictions are not included in the offender score if, since the last date of

release from confinement, the offender had spent ten consecutive years in the community

without committing any crime that subsequently results in a conviction.

RCW 9.94A.525(2)(b). In turn, with some exceptions, class C prior felony convictions

are not included in the offender score if, since the last date of release from confinement,

the offender had spent five consecutive years in the community without committing any

crime that subsequently results in a conviction. Residential burglary constitutes a class B

felony. RCW 9A.52.025. Harassment is a class C felony. RCW 9A.46.020.

Before his July 17, 2013 sentencing for a domestic violence assault committed on

April 18, 2013, James House had spent seven years in the community without

committing a new offense leading to conviction. Thus, the 1996 harassment conviction washed out. House has never spent more than ten years in the community after his release from his 1996 residential burglary conviction. Therefore, the burglary conviction did not wash out. Because the current sentencing court convicted House with the serious crime of first degree burglary, the court needed to count House's 1996 conviction for residential burglary as two, not one, points. RCW 9.94A.525(10).

## Current Convictions

### *offender scores*

To repeat, the State convicted James House with first degree burglary, indecent liberties, second degree assault, and unlawful imprisonment. The sentencing court scored his convictions for burglary and assault as being the same criminal conduct. All four convictions carried a domestic violence appellation, which can double the score for some earlier and current convictions.

On appeal, James House argues that the sentencing court should have scored other current crimes as the same criminal conduct. He first contends that both the crimes of unlawful imprisonment and indecent liberties constituted the same criminal conduct as his burglary. House next contends that the crimes of assault and indecent liberties respectively formed the same criminal conduct as the unlawful imprisonment conviction. He emphasizes that he could not have committed either indecent liberties or unlawful imprisonment without first committing burglary. He entered C.M.'s residence without

13

permission in order to commit unlawful imprisonment and indecent liberties, thereby also perpetrating burglary. House also argues that the crimes of assault and indecent liberties could not have been committed without having committed unlawful imprisonment. His restraint of C.M. enabled him to assault C.M. and perform oral sex on her. The same overall purpose shadowed all three crimes. House, however, does not isolate or specify that overall purpose.

Under James House's analysis, all four current convictions collapse together. In turn, he argues that, with this collapse, his offender score for the most serious offense of first degree burglary is eight. We calculate the offender score to be seven, however, assuming all four crimes to constitute the same criminal conduct. In a letter to counsel, we asked each party to identify how he or it arrived at House's offender score. In his response, House did not identify a score for his earlier convictions. He also has not designated an offender score on the assumption that no more crimes are adjudged to be the same criminal conduct. Because of the minutiae involved in any calculation and its unimportance to this appeal, we do not outline our calculation.

The State, like us, scores James House's earlier convictions as seven points. In turn, the State scores James House's current convictions as totaling three points. According to the State, first degree burglary offense, having the most serious level of the current offenses, should serve as the controlling conviction for purposes of scoring. RCW 9.94A.515, Serious Level VII. Because a domestic violence appellation attached to

14

the first degree burglary conviction, other domestic violence offenses listed in RCW

9.94A.525(21)(a) count as two points. The statutory subsection lists unlawful

imprisonment, but not indecent liberties. Thus, the unlawful imprisonment current

conviction bears a score of two, and the indecent liberties carries a score of one, for a

total of three points. When adding the score of seven from the earlier convictions,

House's score, according to the State, is ten. We agree with the State that House's

offender score reaches ten if only the current burglary and assault convictions are scored

as same criminal conduct. House does not argue to the contrary.

Our decision requires the court to answer four discrete questions. First, do James

House's convictions for first degree burglary and indecent liberties constitute the same

criminal conduct? Second, do House's convictions for first degree burglary and unlawful

imprisonment constitute same criminal conduct? Third, do the convictions for indecent

liberties and unlawful imprisonment constitute same criminal conduct? Fourth, do the

convictions for second degree assault and unlawful imprisonment constitute same

criminal conduct? If we answered all questions or at least three of the questions in the

affirmative, all crimes would collapse into one current crime.

The State argues that James House's offender score will remain nine plus unless

this court scores both unlawful imprisonment and indecent liberties as being the same

criminal conduct as first degree burglary. In other words, unless we agree with House

that all four convictions fold into the same criminal conduct, House receives no relief.

The sentencing grid only acknowledges an offender score as high as nine, and the State does not seek an exceptional sentence based on some convictions going unpunished. RCW 9.94A.510; *State v. France*, 176 Wn. App. 463, 468, 308 P.3d 812 (2013). Assuming we accepted House's erroneous calculation of his earlier convictions being a score of eight, we would agree with the State. But with the correct calculation of prior crimes being seven, House's offender score could now be eight. We need not resolve this discrepancy, however, since we adjudge no other current crimes to be same criminal conduct.

*same criminal misconduct*

We now undertake the task of evaluating whether more of James House's current convictions should be scored as enveloping same criminal conduct. When sentencing an offender for one or more felonies, the trial court must calculate the defendant's offender score, which score influences the offender's standard sentence range. The sentencing court computes an offender's score based on the number of current and earlier convictions. RCW 9.94A.525, .589(1)(a); *State v. Aldana Graciano*, 176 Wn.2d 531, 535-36, 295 P.3d 219 (2013). If the court finds that some of the current offenses encompass the same criminal conduct, the sentencing court must count those current offenses as one crime for purposes of the score. RCW 9.94A.589(1)(a); *State v. Aldana Graciano*, 176 Wn.2d 531, 536 (2013).

The same criminal conduct rule provides sentencing courts an important tool to ameliorate the harsh effect of prosecutorial overcharging. *State v. Westwood*, 2 Wn.3d 157, 169, 534 P.3d 1162 (2023) (Madsen, J. dissenting). Under the rule, crimes, when committed with the same objective intent to further a criminal act against the same victim at the same time should be punished as one crime. *State v. Westwood*, 2 Wn.3d 157, 169 (2023) (Madsen, J. dissenting). Without this protection, prosecutors may charge multiple crimes arising from a single incident, each carrying its own punishment, and a sentencing judge would be required to impose a sentence for each crime. *State v. Westwood*, 2 Wn.3d 157, 169-70 (2023) (Madsen, J. dissenting). A court may use this offender score tool even though the Double Jeopardy Clause would not bar two punishments.

RCW 9.94A.589(1)(a) governs application of the same criminal conduct principle. The statute, enacted in 1987, declares:

> That if the court enters a finding that some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime. . . . "Same criminal conduct," as used in this subsection, means two or more crimes that require the *same criminal intent*, are committed at the same time and place, and involve the same victim.

(Emphasis added.) The focal sentence in RCW 9.94A.589(1)(a) directs the sentencing court to concentrate on the offender's criminal intent, the identity of the victim or victims, and the location and timing of the crimes. *State v. Aldana Graciano*, 176 Wn.2d 531, 536 (2013). The defendant bears the burden of establishing all prongs of the test. *State v. Aldana Graciano*, 176 Wn.2d 531 (2013); *State v. Vike*, 125 Wn.2d 407, 410, 885

P.2d 824 (1994); *State v. Wright*, 183 Wn. App. 719, 733, 334 P.3d 22 (2014).  If any element is missing, the sentencing court must count the offenses separately when calculating the offender score.  *State v. Westwood*, Wn.3d 157, 162 (2023); *State v. Vike*, 125 Wn.2d 407, 410 (1994).

Deciding whether crimes involve the same intent, time, place, and victim often involves factual determinations.  *State v. Aldana Graciano*, 176 Wn.2d 531, 536 (2013).  Thus, the trial court exercises discretion.  *State v. Westwood*, 2 Wn.3d 157, 162 (2023).  Based, in part, on the need to review and weigh facts, this reviewing court will not disturb the sentencing court's decision unless the sentencing court abuses its discretion or misapplies the law, the latter which by definition is an abuse of discretion.  *State v. Aldana Graciano*, 176 Wn.2d 531, 531 (2013); *State v. French*, 157 Wn.2d 593, 613, 141 P.3d 54 (2006).

We construe RCW 9.94A.589(l)(a) narrowly to disallow most assertions of same criminal conduct.  *State v. Aldana Graciano*, 176 Wn.2d 531, 540 (2013); *State v. Palmer*, 95 Wn. App. 187, 190-91, 975 P.2d 1038 (1999).  The default method of calculating an offender score is to treat all current convictions as separate and distinct criminal conduct.  *State v. Westwood*, Wn.3d 157, 162 (2023).

In James House's appeal, we focus only on the first element of RCW 9.94A.589(1)(a)'s same criminal conduct test: same criminal intent, a test often labeled as similar intents.  The State and James House focus on the element of intent,

presumably because only one victim suffered from House's crimes and he committed the crimes at one location within a one-hour window of time.

Neither RCW 9.94A.589(1)(a) or a related statute elucidates what criteria the sentencing court employs when assessing whether two crimes occasion the "same criminal intent." The statute nowhere states that the sentencing court refers to the intents required by statute to convict the offender of the respective crimes. Nowhere does RCW 9.94A.589(1)(a) or an accompanying statute mention employment of the mens rea of a crime. No statute instructs the sentencing court as to evaluating same criminal intent on the offender's subjective intent or personal goals in perpetuating the crimes or some objective intent discerned by the court.

Last calendar year, the Washington Supreme Court, in *State v. Westwood*, 2 Wn.3d 157 (2023), issued a seminal decision regarding same criminal intent. Beforehand, sentencing courts faced a bewildering array of case law from the Supreme Court and the Court of Appeals that announced various abstruse tests of sameness, that occasionally adopted conflicting rules of law, and that sporadically prompted inconsistent opinions. In *State v. Westwood*, the Supreme Court, despite four of its members dissenting, protested that its jurisprudence on similar intents had always been settled and evident.

In *State v. Westwood*, Dahndre Westwood entered A.B.'s house at 4:30 a.m. A.B. saw Westwood standing in her hallway and holding a knife in his hand. A.B. yelled at

him to leave, but Westwood pushed A.B. into the bedroom. Westwood ordered her to

undress and threatened to kill her if she did not cooperate. A.B. screamed for help and

pleaded for her life. A.B. clawed at Westwood and knocked the knife out of his hand.

Westwood choked and suffocated A.B. to muffle her screams for help and hit her

repeatedly on the head. During the struggle, Westwood nicked A.B. with the knife,

leaving a scar on her cheek. Westwood stopped his assault after car headlights passed

and shone in a window. As he exited A.B.'s residence, Westwood threatened A.B. that,

if she told anyone about the assault, he would kill her.

A jury convicted Dahndre Westwood of attempted rape in the first degree, assault

in the first degree, and burglary in the first degree. At sentencing, Westwood argued,

while relying on *State v. Dunaway*, 109 Wn.2d 207, 743 P.2d 1237 (1987), that all three

convictions encompassed the same criminal conduct for offender scoring purposes. In

response, the State asked the sentencing court to apply a test announced by the Supreme

Court in *State v. Chenoweth*, 185 Wn.2d 218, 370 P.3d 6 (2016) and to score each crime

separately. The trial court followed *Chenoweth* and determined that the three convictions

did not constitute the same criminal conduct because the legislature furthered different

purposes when respectively outlawing assault, burglary, and rape.

We will eventually discuss the ruling of the state Supreme Court in *State v.*

*Westwood*, which ruling upheld the sentencing court and ruled Dahndre Westwood's

crimes to entail separate intents. In an attempt to better understand the Washington

Supreme Court's decision, however, we detour and first review the high court's decisions in *State v. Dunaway*, 109 Wn.2d 207 (1987) and *State v. Chenoweth*, 185 Wn.2d 218 (2016) and our own decision in *State v. Westwood*, which the Supreme Court reversed. *State v. Westwood*, 20 Wn. App. 2d 582, 500 P.3d 182 (2021).

The Washington Supreme Court decided *State v. Dunaway* in 1987 before the legislature adopted the relevant language found in RCW 9.94A.589(1)(a). Nevertheless, the Supreme Court has since written that the legislature, when fashioning the language, adopted the test formulated in *Dunaway*. In *Dunaway*, the Supreme Court determined that robbery and first degree kidnapping constituted the same criminal conduct because the accused committed the kidnapping in order to rob the victims.

At the Alderwood Mall, James Dunaway entered a car occupied by two women. He displayed a gun and directed the driver to drive to Seattle. In the meantime, at Dunaway's direction, each lady handed him all cash on her person. When the trio reached Seattle's University District, Dunaway demanded the passenger to enter Rainier Bank and withdraw money for him. The lady entered the bank and did not return. At Dunaway's command, the driver moved to the passenger seat, and Dunaway drove the car elsewhere in Seattle, where he exited the car.

When ruling that James Dunaway bore the same criminal intents when committing the separate crimes of first degree kidnaping and robbery, the Supreme Court highlighted that Dunaway's intent to commit robbery enabled the State to raise the charge of

21

kidnapping from second degree to first degree. Robbery constituted the objective behind both crimes. First degree kidnapping entailed intentionally abducting someone with the intent to facilitate the commission of another felony. First degree kidnapping entailed a mens rea beyond robbery since the former crime included the intent to abduct someone, but this difference did not influence the Supreme Court.

In *State v. Chenoweth*, 185 Wn.2d 218 (2016), the State convicted Chad Chenoweth with rape of a child in the third degree and incest. The victim was Chenoweth's daughter. The opinion spares the reader from a recitation of the facts behind the prosecution. The Evergreen State high court ruled that incest and child rape did not form the same criminal misconduct despite each crime being based on the identical act.

RCW 9A.44.079 governs rape of a child in the third degree and occurs when:

> the person has sexual intercourse with another who is at least fourteen years old but less than sixteen years old and not married to the perpetrator and the perpetrator is at least forty-eight months older than the victim.

RCW 9A.64.020 controls incest and occurs when a person

> engages in sexual intercourse with a person whom he or she knows to be related to him or her . . . as an ancestor, descendant, brother, or sister.

Neither of the statutes demands any particular mens rea. The State does not need to prove beyond a reasonable doubt that the accused intended any action or result only that he committed specific actions. Still, the Supreme Court reasoned that the intent to

engage in sex with a child differed from the intent to have sexual intercourse with a family member. Thus, the Supreme Court scored Chad Chenoweth's convictions separately.

The Supreme Court, in *State v. Chenoweth*, impliedly applied a double jeopardy analysis by proffering that the legislature intended to punish the crimes of rape and incest as separate offenses. Under double jeopardy jurisprudence, the court reviews the two statutes creating separate crimes and assesses whether the legislature intended to separately punish the conduct forming the crimes if the same conduct violates each statute. *State v. Freeman*, 153 Wn.2d 765, 771-72, 108 P.3d 753 (2005). When holding that the two crimes represented distinct intents, the Supreme Court in *Chenoweth* emphasized that the legislature placed the crimes of rape and incest in two discrete chapters of the criminal code. RCW 9A.44 controls sexual offenses. RCW 9A.64 controls family offenses. The former statute attacks the evil of sex with a child. The latter statute outlaws sex with a family member.

Contrary to the reasoning of the Supreme Court in *State v. Chenoweth*, RCW 9.94A.589(1)(a) does not direct the sentencing court to consider the legislature's desire to punish crimes separately when analyzing same criminal intent. Otherwise, a sentencing court might never hold that two or more crimes constitute same criminal conduct. Nor does the statute suggest indexing of crimes in the criminal code holds any importance.

23

We note that *State v. Chenoweth*, like *State v. Westwood*, is also a 5 to 4 decision. The minority observed that Chad Chenoweth's objective criminal purpose for both crimes was sexual intercourse with his daughter. The majority and the minority both avoided an analysis of the mens rea required under the respective statutes. Their disagreement centered around whether to focus broadly or narrowly on the accused's purpose of committing the crime. Although Chenoweth wanted to have sex with his daughter, the majority tacitly deemed that this intent could be separated into two facets: the desire for sexual gratification with a child and the longing for carnal pleasure with a family member. The majority never asked whether Chenoweth was motivated for sex with his daughter solely because she was his daughter or solely because she was a family member. The majority never asked if Chenoweth engaged in sex with his daughter solely because she was readily available or because, as her father, Chenoweth could coerce her or force her into sexual intercourse. This lack of inquiry resulted in part from the firm principle that the sentencing court assesses an objective intent in committing the crime, not the accused's subjective intent.

A reasonable lower court and legal practitioner would deem the *Dunaway* test to differ from the *Chenoweth* analysis and that in some cases the different tests would result in different outcomes. The *Chenoweth* test emphasized the evil sought to be eradicated by the legislature. *Chenoweth* ignored an examination of statutory mens rea. The *Dunaway* test highlighted whether one crime enabled the commission of a second crime

24

and whether the two crimes had an overlapping statutory mens rea. Nevertheless, the Supreme Court, in *State v. Westwood*, insisted that these two earlier decisions established the same test for discerning same criminal intent.

We return to *State v. Westwood* with a discussion first of the Court of Appeals' decision. This court remanded the sentencing of Dahndre Westwood to the superior court to apply the same criminal conduct test purportedly emanating from *State v. Dunaway*, not from *State v. Chenoweth*. *State v. Westwood*, 20 Wn. App. 2d 582, 586 (2021). We concluded that the *Chenoweth* test only applied to convictions for incest and rape. We thought that *Dunaway* held that a court assesses the intent component of the same criminal conduct analysis not by the statutory mens rea of the offenses but by whether the defendant's criminal intent, viewed objectively, changed from one crime to the next. Intent, in this context, comprises the offender's objective criminal purpose in committing the crime, such as stealing money or killing another. The trial court may employ various ways in determining objective criminal purpose, which methods include ascertaining the extent of the interrelationship between the two crimes, evaluating the change in the criminal objective from one crime to another, asking whether one crime furthered the other, or questioning whether the offenses were part of a plan or scheme. We recognized that different finders of fact might reach different conclusions.

This court, in *State v. Westwood*, noted that the Supreme Court decided *State v. Chenoweth* without any mention of *State v. Dunaway*. We thought that, in the later

25

decisions of *State v. Bobenhouse*, 166 Wn.2d 881, 214 P.3d 907 (2009) and *State v. Calle*, 125 Wn.2d 769, 888 P.2d 155 (1995), the Supreme Court limited *Chenoweth* to the narrow confines of a combination of rape and incest. We held the sentencing court not bound by *Chenoweth* under the circumstances of Dahndre Westwood's crimes. We remanded sentencing and directed the trial court to exercise its discretion in resolving whether, as a factual matter, Westwood's objective criminal purpose remained the same from one crime to the next, those crimes being attempted rape, assault, and burglary.

We now parse the Supreme Court's decision in *State v. Westwood* in an endeavor to apply the recent decision to James House's challenge to his offender score. The *Westwood* court labeled the same criminal conduct test as "an objective intent analysis." *State v. Westwood*, 2 Wn.3d 157, 162 (2023). At the beginning of its opinion, the court described the objective intent analysis as looking "at the statutory criminal intent of each of the offenses." *State v. Westwood*, 2 Wn.3d 157, 162 (2023). Therefore, the sentencing court must look to the statutory definition of intent for each of the crimes. *State v. Westwood*, 2 Wn.3d 157, 163 (2023). This analysis ignores the defendant's subjective intent and declines to consider whether the defendant maintained a consistent intent throughout the crimes. *State v. Westwood*, 2 Wn.3d 157, 162 (2023). The analysis disregards whether the offender committed the crimes in a continuous course of conduct. *State v. Westwood*, 2 Wn.3d 157, 163 (2023).

At the beginning of its opinion when writing that the sentencing court looks "at the statutory criminal intent of each of the offenses," the court added: "and whether the crimes furthered each other." *State v. Westwood*, 2 Wn.3d 157, 162 (2023). The court does not explain what the sentencing court does if the criminal intent of the two offenses is identical but neither crime furthered the other. The court later wrote that if the intent of the two crimes is the same, the court must then consider whether the offenses were committed as part of the same scheme or plan and whether one crime furthered the other, with no substantial change in the nature of the criminal objective. *State v. Westwood*, 2 Wn.3d 157, 165 (2023).

We assume that, when one crime furthers another crime, the offender typically possesses an underlying goal that motivated the commission of both crimes. But this observation moves the analysis of similar criminal intent away from reviewing the statutory intent or mens rea of the crimes and into the realm of the subjective intent of the offender. If Washington's objective intent analysis focuses on the statutory criminal intent of each of the offenses, whether one crime actually furthered another crime should lack importance.

We read *Westwood*'s initial description of the objective intent analysis as requiring us to identify the statutory mens rea needed to convict the accused of the respective crimes sought to be ruled same criminal conduct. But this test raises many difficult questions. We wonder what to do with strict liability crimes that require no intent or

whether we can compare crimes that punish negligent, reckless, or knowing conduct with one another and with crimes of specific intent. We wonder if only crimes that require a specific intent may be the same for purposes of same criminal conduct.

Since the jury must find, for purposes of many convictions, that the accused possessed the subjective intent mentioned in the statute identifying the crime, we wonder if *Westwood*'s professed disregard of subjective intent makes sense. Perhaps, this wonderment led to the *Westwood* court writing that the test for same course of conduct "is not dependent on the offender's subjective intent, beyond the mental state required for the commission of the offense." *State v. Westwood*, 2 Wn.3d 157, 164 (2023) (quoting *State v. Callaway*, 42 Wn. App. 420, 424, 711 P.2d 382 (1985)).

After explaining the same criminal intent analysis, the Supreme Court, in *State v. Westwood*, analyzed the statutory definitions of the crimes for which the jury convicted Dahndre Westwood: attempted rape in the first degree, first degree assault, and first degree burglary. Attempted rape in the first degree requires the intent to commit the crime of rape and taking a substantial step toward first degree rape. RCW 9A.28.020. First degree rape includes forcible sexual intercourse with another person when employing a deadly weapon, kidnapping the victim, inflicting serious injury, or feloniously entering a building. RCW 9A.44.040. First degree assault requires an intent to inflict great bodily harm and the infliction of that harm. RCW 9A.36.011. First degree burglary requires an entry into a building without consent and with intent to commit a

28

crime against a person or property. RCW 9A.52.020. After reviewing the statutory definitions of the crimes, the Supreme Court concluded that the legislature intended that the intent necessary to prove all three crimes differed. The Supreme Court reversed the Court of Appeals and affirmed the sentencing court's ruling that the crimes did not involve the same criminal conduct. We note that the assault and the burglary by Westwood raised the attempted rape charge to first degree rape, but this phenomenon was of no consequence.

The Supreme Court, also in *State v. Westwood*, claimed that its ruling in *State v. Chenoweth* followed the ruling in *State v. Dunaway*. According to *Westwood*, the *Chenoweth* court looked at the statutory intent of the crimes of incest and rape of a child and found separate intents. The *Westwood* court did not identify the two purported different intents of incest and child rape. The *Dunaway* court merely cited to the two statutes and did not quote or analyze the statutes. We have already noted that incest and third degree rape of a child require no particular intent.

The *Westwood* court announced that the sentencing court should decline to consider whether the defendant actually maintained a consistent intent throughout the crimes. This announcement together with other announcements conflict with *State v. Dunaway* which held Dunaway's crimes to be same criminal conduct because he engaged in the kidnapping in order to take money from the women.

Four justices, led by Justice Barbara Madsen, dissented in *State v. Westwood*. The dissent criticized the majority for conflating the same criminal conduct test with the test for double jeopardy. According to the dissent, the majority, instead of providing clarity, reinvented the objective intent test by claiming the test focuses on the statutory definitions of the crimes to determine the objective intent. The dissenting opinion painstakingly journeyed through the numerous Supreme Court decisions and showed the error in the majority's proclamation that the court's decisions had always focused on the language of statutes that created the various crimes. The dissent, like the majority, wrote that a sentencing court must apply an objective intent test, but the dissent declared that the test focuses on the extent to which the criminal intent, as objectively viewed, changed from one crime to the next, not on the statutory criminal intent, which is the focus of a double jeopardy analysis. The dissent agreed with our decision's observation that statutory criminal intent of crimes is not objective. Thus, if the correct analysis relies on the language of the statute, as posited by the *Westwood* majority, the inquiry, by nature, is one of subjective intent.

In light of *State v. Westwood*'s instruction to inspect the statutory criminal intent of each of the offenses, we review the statutory mens rea for the four respective crimes of James House's convictions. Under RCW 9A.52.020, one commits the crime of first degree burglary when:

> *with intent to commit a crime against a person or property therein*, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person.

(Emphasis added.)

One commits second degree assault when:

> he or she, under circumstances not amounting to assault in the first degree:
> (a) *Intentionally assaults* another and thereby recklessly inflicts substantial bodily harm; or
> . . . .
> (c) Assaults another *with a deadly weapon*; or
> . . . .
> (e) *With intent to commit a felony*, assaults another; or
> (f) *Knowingly inflicts bodily harm* which by design causes such pain or agony as to be the equivalent of that produced by torture; or
> (g) *Assaults another by strangulation* or suffocation.

RCW 9A 36.021 (emphasis added). Under the list of alternate means by which to commit second degree assault, an accused could commit the crime with the intent to strike the victim, with the intent to commit any felony, with the knowledge of inflicting bodily injury but without any specific intent, or by strangulating or suffocating the victim without any specific intent. Only one of those mens rea aligns with the statutory mens rea necessary to commit first degree burglary, that being the intent to commit any felony. The State alleged, in the charging information, that James House committed second degree assault by either strangulation or use of a deadly weapon, not with the intent to commit another felony or with any particular specific intent.

31

RCW 9A.44.100, the indecent liberties statute, proscribes, in pertinent part:

> (1) A person is guilty of indecent liberties when he or she *knowingly* causes another person to have sexual contact with him or her or another:
> (a) By forcible compulsion;

(Emphasis added.) The succinct unlawful imprisonment statute, RCW 9A.40.040,

declares:

> (1) A person is guilty of unlawful imprisonment if he or she *knowingly* restrains another person.

(Emphasis added.)

We grapple, in James House's appeal, with applying the objective intent analysis, at least in its form as announced in *State v. Westwood* of referencing the statutory criminal intent of each crime. The State concedes on appeal that second degree assault and first degree burglary constituted the same criminal conduct because the State employed the assault as the predicate crime for burglary. The assault raised the burglary charge to first degree. But the objective intent analysis does not revolve around whether one crime serves as a predicate crime for the other crime. The Supreme Court, in *State v. Westwood*, held all crimes to be separate despite two of the crimes raising the burglary to first degree burglary.

We observe that the statutory mens rea for first degree burglary and second degree assault do not conflate. One commits first degree burglary by entering the property with the intent to commit any crime, not with the intent to commit a predicate crime or a

particular crime charged by the State. In its charging information, the State did not allege any particular crime that James House intended to perpetrate when he entered C.M.'s residence.

Based on the objective intent analysis, as announced in *State v. Westwood*, the State and the superior court may have erred when determining second-degree assault and first degree burglary to be the same criminal conduct. We assign no fault to either because of the continuing confused nature of the quest to discern same criminal conduct. The Supreme Court issued *State v. Westwood* after James House's sentencing. As far as we know, the Supreme Court will also declare us to be wrong. Regardless, neither party on appeal challenges the sentencing court's consideration of the assault and burglary being the same criminal conduct.

When employing the stated objective intent analysis to James House's assignments of error, we conclude that the crimes of unlawful imprisonment and indecent liberties did not involve the same criminal conduct as House's burglary. Also, the crimes of assault and indecent liberties did not form the same intent as unlawful imprisonment. The mens rea of unlawful imprisonment is knowingly restraining another, the mens rea of burglary is entering a residence with the intent to commit a crime, the mens rea of second degree assault is various, and the mens rea of indecent liberties is knowingly forcing another into sexual relations.

33

When committing his four crimes, James House may have possessed an overarching goal in killing C.M., terrorizing her, or forcing sex on her. He engaged in one scheme throughout his conduct. But we read *State v. Westwood* to direct us to ignore House's subjective desires. James House's burglarizing C.M.'s home and restraining her enabled him to assault C.M. Also, House's unlawful entry into the residence and unlawful imprisonment of C.M. permitted him to commit the crime of indecent liberties. We read *State v. Westwood*, however, to direct us to address whether one crime furthers another crime only after determining that the statutory intents of the crimes are similar.

The circumstances in this appeal mirror the circumstances in *State v. Westwood* wherein the Supreme Court scored all crimes separately. Dahndre Westwood entered A.B.'s house in the early morning hours without A.B.'s consent. James House entered C.M.'s house without permission at 1:37 a.m. Westwood brandished a knife. House carried a knife. Westwood choked and suffocated A.B. House strangulated C.M. During a struggle, Westwood cut A.B. with the knife, leaving a scar on her cheek. During the excitement of police entering the residence, House cut C.M.'s arm and face. Westwood attempted to sexually assault A.B. House successfully forced oral sex on C.M.

A jury convicted Dahndre Westwood of attempted rape in the first degree, assault in the first degree, and burglary in the first degree. Despite the events occurring over a limited space in time and despite Westwood likely committing all crimes with the one

34

goal of rape, the Supreme Court scored the crimes of burglary, assault, and attempted rape as separate crimes. The fact that the burglary and assault furthered the attempted rape was of no consequence.

Under *State v. Dunaway*, some of Dahndre Westwood's crimes might have been scored as one. Also, under *State v. Dunaway*, more of James House's crimes would probably be scored as one. After *State v. Westwood*, *Dunaway* is kaput.

Based on the teachings of *State v. Westwood*, we conclude the sentencing court committed no error when calculating James House's offender score. Assuming any error, that error benefitted House.

## CONCLUSION

We affirm the trial court's assessment of James House's offender score and affirm his sentence.

_____
Fearing, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Staab, J.